IN THE MATTER OF L.M.A.



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:IN THE MATTER OF L.M.A.

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 IN THE MATTER OF L.M.A.
2020 OK 63
Case Number: 118136
Decided: 06/30/2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 63, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

IN THE MATTER OF L.M.A., K.M.A., and P.A., Adjudicated Deprived Children,

CHRISTOPHER F. ALFRED, Appellant,
v.
THE STATE OF OKLAHOMA, Appellee.

APPEAL FROM DISTRICT COURT OF OKLAHOMA COUNTY

¶0 Three minor children were removed from their home. Their mother voluntarily terminated her parental rights. A jury trial was held before the Honorable Lydia Y. Green, Special Judge for the District Court of Oklahoma County, the children were adjudicated deprived by the court and the jury's verdict found two reasons for terminating father's parental rights. Father appealed the judgment and the Oklahoma Supreme Court retained the appeal. We hold: the evidence was sufficient for the adjudication of deprived status and termination of father's parental rights.

DISTRICT COURT JUDGMENT AFFIRMED

Kacey L. Huckabee, Oklahoma City, Oklahoma, for Appellant.[1]

Rebecca Bauer, Assistant District Attorney, Oklahoma County, Oklahoma City, Oklahoma, for the State of Oklahoma.[2]

EDMONDSON, J.

¶1 This case involves three children and a trial in the District Court which determined the children were deprived and father's parental rights should be terminated.

Father appealed to this Court and argues the evidence was insufficient. We hold the evidence was sufficient.

¶2 Three children were taken into emergency custody pursuant to an order of the District Court in September 2016. The ages of the three children were approximately 3 years, 2 years, and 10 months. Their mother was temporarily incarcerated at this time in a county jail. An emergency custody show cause hearing was held with both parents present and both waived a show cause hearing. The State filed a petition and alleged the home of mother and father was inadequate, dangerous, and unfit, and that the children were deprived. The petition alleged inadequate caregivers were provided, and the children suffered certain conditions of neglect. Allegations relating to the children included, but were not limited to, child developmental delays, lack of medical care, lack of hygiene, and lack of food in the home. Several other allegations were made including the unfitness of mother and father. The petition sought to terminate father's parental rights based upon 10A O.S.Supp.2015 § 1-4-904 (A) & (B) (8)(b) and father's previous conviction for two counts of rape in the first degree in a 2005 Oklahoma County case.[3] The petition also referenced father's previous conviction in Alaska for assault with intent to commit a felony (sexual assault).

¶3 Mother was released from a county jail shortly after the children were taken into DHS custody. Father was arrested in January 2017 for violating the conditions of his probation, released temporarily, and again arrested and taken into custody after his domestic abuse assault and battery upon the mother of these children. Father has been incarcerated since January 2017.

¶4 The Department of Human Services (DHS), mother, and certain organizations worked for several months to achieve a reunification of mother and children as a family. Father was incarcerated during this time. After efforts for family reunification were unsuccessful, DHS recommended termination of the parental rights of mother in May 2018. Mother personally appeared in the trial court and gave her voluntary consent for termination of her parental rights. The trial court considered exhibits admitted into evidence at the hearing. The children were adjudicated deprived as to mother. The court terminated mother's parental rights, dismissed her as a party in further proceedings, and allowed her counsel to withdraw. The trial court noted at this same hearing one child had been placed with the child's maternal relative, and potential placement of a second and third child with this same relative was discussed.

¶ 5 Father remained incarcerated after mother's voluntary termination of her parental rights in May 2018, and the State filed an amended petition in August 2018 to terminate his parental rights. This petition alleged the children were deprived as to father, repeated the request to terminate his parental rights pursuant to 10A O.S.Supp.2015 § 1-4-904 (A) & (B) (8)(b) and added the additional claim his parental rights should be terminated pursuant to 10A O.S.Supp.2015 § 1-4-904 (A) & (B) (12) because he was incarcerated.[4]

¶6 The State requested a jury trial to terminate father's parental rights. A jury trial was held and a journal entry was entered on the verdict. The journal entry states the children were adjudicated deprived by the court.[5] The journal entry states the father failed to provide the proper care and guardianship necessary for the children's physical and mental well-being, the home of the father was unfit due to domestic violence, the home of the father was unfit due to not providing a stable home, home of the father was unfit due to mental health, the home of the father was unfit due to threat of harm. The jury found father's parental rights should be terminated as to each of the three children. The jury relied on father's incarceration and father's conviction of first degree rape. The jury found termination of the parental rights was in the bests interests of the children. The court ruled father had a duty to support his children unless or until an adoption of the children is completed. The court ordered the children to remain wards of the court.

¶7 Father appealed and this Court retained the appeal. His four assignments of error in his appellate brief[6] are: (1) The evidence was insufficient to show the children were deprived. (2) The evidence was insufficient to terminate father's parental rights due to incarceration because the State did not show father's parental rights would cause harm to the children. (3) The evidence was insufficient to show the children would be neglected or abused in the father's custody. (4) Trial court committed an abuse of discretion by allowing prejudicial evidence presented to the jury.

I. The Trial

¶8 The first witness was a Child Welfare Specialist and foster care worker, formerly in Child Protective Services and having investigated allegations relating to safety of children. His employment required a bachelor's degree and specialized training. He testified that in father's case a joint response occurred with the Oklahoma City police department and the "overnight unit" and he reviewed the reports the next day. This same day two child safety meetings were held for the purpose of determining whether a plan could be put in place without taking the children into custody. He stated he was concerned due to the lack of food for the children and father leaving the children with inappropriate caregivers while father was at work.

¶9 He stated some of his concerns such as the two oldest children not being able to walk in shoes and the middle child's lack of speaking. He testified concerning father's conviction, registration as a sex offender, probation status, and prior referrals for the family. A record of immunizations for the children could not be determined. He recommended the children be placed in DHS custody because they were not adequately supervised, the living conditions in the home, and because they were not receiving medical attention.

¶10 On cross examination the witness stated he had not been personally present in the home to observe the lack of food or an inappropriate caregiver. He also testified the father told him the children were left by father with "prostitutes and junkies" to care for the children while the father was at work. He explained the father gave this information at one of the two child safety meetings in response to a question by a facilitator at the meeting asking why a concern was raised about the babysitters.

¶11 The child welfare specialist testified when the children were taken into custody the father provided clothing for the children which "did not fit," "smelled of urine," and was "unclean." He was asked how he personally knew the clothes did not fit and smelled of urine. He testified he knew about the clothing because "the clothes in the bag were so pungent that we had to move them to a different spot because they were overpowering, the smell of urine was overpowering." He testified clothes for the children from their home were brought to the meeting in two bags, one by father and one by the initial case worker, and both smelled of urine.

¶12 The second witness was a DHS employee who testified that the oldest child, a three-year-old, would not speak and would make sounds but no words. This child communicated by using hands for pointing. During DHS custody she received, and was continuing to receive, therapy she needed. By the time of father's trial this child was speaking and attending kindergarten, although using fewer words than typical for her age. The witness testified the middle child had self-harming, talking, and other issues. She testified on the individual needs of the children and "the amount of therapy that they receive is extensive." Testimony and the record on appeal show counseling, therapy, and participation in different programs for the children was started shortly after being taken into custody and continued in various forms. The children had family counseling with their mother before she relinquished her parental rights. At the time of trial the youngest child was exhibiting normal behavior for the child's age.

¶13 Counsel for father questioned whether testing had been performed on both mother and father. The witness said the evaluation of mother had been requested but not completed prior to her relinquishment of her parental rights, and "Dad wouldn't attend . . . for us to find out if there was anything we needed to do, if there was any other issues." Counsel then pressed: "Now, let's be realistic. You all were never going to do an FFA because you were going to terminate. So if you were not going to allow him to do any services, you were never going to do an FFA." The witness testified: "There were some scheduled that he never showed up for." The witness also explained: "We have service plans on individuals who are on a termination case plan goal." The witness was questioned whether the children have ever had an evaluation to determine the reason why they are having behavioral issues and whether such is a result of being in the home or in DHS custody. The witness replied "yes," but then explained that the evaluations were based upon the services and therapy the children needed at that time and not to determine a first or ultimate cause of a behavioral issue.

¶14 Counsel for father questioned whether children needing therapy was the result of being in DHS custody. The witness testified a self-harm issue with one of the children was not caused by being in DHS custody. She answered counsel's question explaining she knew this because the child had the issue "since the opening of the case," and the child's mother told her the child had the same behavior at home prior to being taken into custody. Counsel for father again pressed the witness on whether the child's behavior was the result of a lack of stability caused by being in DHS custody with different placements. The witness testified a cause for the child's behavior could not be placed on the doorstep of "DHS exclusively."

¶ 15 The youngest child, approximately ten-months-old when taken into custody, had the fewest behavioral issues for DHS to address, and the witness opined this was due to the child's age and less amount of time in the family home prior to DHS custody. She was asked whether her opinion was based on "scientific support" or "scientific evidence," or "scientifically," or "scientifically of proving." She admitted her conclusion was her "personal opinion." The witness also admitted that she could not say whether the cause of one child's developmental issues was from genetics or exposure to different environments. The witness said she was attributing cause based upon the lack of issues with the youngest child combined with experience she personally had with other children "born into custody" who do not have certain issues, or to the same extent, which may occur in children taken into custody from a home environment. The witness admitted when questioned there was "no way scientifically of proving that anything these children are dealing with is the result of being with their father versus being in DHS custody." The transcript is not clear on what counsel and the witness meant by phrases such as "scientific method" and "scientifically proving" when applied to causes for behavior exhibited by the children.[7] Since the witness stated a scientific opinion was not being given, no negative inference of a scientific nature against the father was created.

¶16 On cross examination she admitted she did not contact father to determine if he needed services from DHS because of his status as a parent of children in DHS custody. She testified she wrote to father a few times. She testified one of the reasons she did not make the effort while he was in prison was a previous DHS case worker had documented three attempts where father did not "show up" for DHS meetings prior to father being placed into custody in January 2017. Father testified at trial he did not see his kids for "a couple of months" after they were taken into custody because "I had a warrant out for my arrest and I was advised if I came up here I would be arrested." Father also testified this time was December 8, 2016, until his arrest in January 2017. Father appears to be referencing meetings at the county courthouse or county office building for meetings with his children and his desire to avoid arrest if he appeared. Father testified his only contact with this DHS witness resulted from "a court order by the judge for me to write my children." Father then wrote several letters to his children. He also testified the DHS witness responded to father and wrote a lengthy letter to father describing the children, and three photographs were included.

¶17 The DHS witness testified DHS had been focused on providing services for the mother of the children while the father was incarcerated. She stated regular court hearings, reviews, and reports had occurred with ongoing discussions relating to mother's efforts to care for the children, and these proceedings did not include the incarcerated father. She testified she had irregular contact with father's prison caseworker and no contact with father. She stated one of the reasons for these circumstances was that mother had initially been meeting the requirements of her service plan and its goal of reunifying mother and children; and for a period of time "mom had actually moved into a window of having unsupervised visits." Mother later voluntarily terminated her parental rights, and then "the reports [to the court] focused on the father" concerning his sentence and time for incarceration.

¶18 The next witness was the father of the children. He stated he left his children with two women while he went to his place of employment. He stated he did not discover until after his children were taken into custody that one of the women had previously had her parental rights terminated. He stated the second woman was not an appropriate caregiver "according to DHS records," but he thought she was proper as a caregiver when he left his children with her. He testified they were proper caregivers because when he went home he would park at the hotel in a location he could observe them outside, and he would walk to a location outside his room where he could "gauge their interaction with my children to make sure there was no type of abuse or anything that was out of order."

¶19 He testified the allegations against him in the petition to terminate concerning his children were false. He stated the allegations concerning his convictions were true. Father testified their mother took the children for their immunizations to the local public health department. He testified he and the children were living in a room with a kitchenette at an extended-stay hotel. He explained the family had been living in this hotel for "six or seven months" and "I was awaiting my disability check so we could get an apartment." He testified the children slept in the queen or king-sized bed, and he and the mother of the children slept on an air mattress placed on the floor. On a subsequent day of testimony he said he remembered the youngest had a bassinet. He stated the children received a bath every night and their clothes were washed. He stated he did not allow cleaning staff in his room because he had previously had items stolen from the room, and the staff left clean linen at his door.

¶20 He denied saying to officials on the day the children were taken into custody that he had run out of food that day. He was at his work when he received a telephone call from a police officer stating he needed to come home. He stated he was going to buy groceries after work on the day the children were taken into custody. He stated he liked to buy fresh food for the children and he had planned on bringing home cooked and prepared chicken for the children to eat. He testified the government assistance programs for children provided him with what he needed to feed his children.

¶21 He testified on the child developmental delays DHS was trying to correct. He explained when he was a child he had "a lot of developmental delays," and had "the same speech impediment" as the three-year-old child, the oldest of the three. He also stated he knew about the developmental delays of his three-year-old child prior to the child being taken into custody. He commented "we talked about putting her into speech classes." Father was also asked by his counsel why the middle child, the two-year-old, would not speak to anyone, including any of the DHS workers, "and all the other people around at the time." Father explained she doesn't talk to strangers. He also testified the middle child was struggling with issues while in DHS custody because the father has been denied access to the child. He testified the mother of the children had developmental delays.

¶22 Father testified that when he and his family had been residing in a former location the DHS offered to assist him and mother with placing the children in a daycare, and he and mother declined the offer. He subsequently testified he had not placed his children in daycare because they were not "the proper age to be in daycare." He also stated he declined an earlier offer by DHS to put the children in daycare because he thought it wasn't necessary.

¶23 Father testified he did not learn to talk until the age of six or seven. He testified he has split personalities and was taking two medications for this diagnosis, medication for his anxiety, and additional medication he could not remember. He testified concerning his schizophrenia, bipolar disorder, agoraphobia, depression, and post-traumatic stress disorder. He stated he received disability checks for a mental health disability. He testified his mental health issues "had nothing to do with me rearing my children." He testified his status as a "lifetime registered sex offender" "has no bearing on whether I can raise my children. My children are not my victims." He testified his registration as a sex offender would not prevent him from raising his children or participating in their school activities and being a good father for them. The "special conditions" of his probation included a prohibition on his presence at a school for children, and father argued this did not apply to him because he had agreed to this before his children were born. He later testified he could, when necessary, petition a District Court to modify these special provisions. He testified he was fifty years old and had five additional children, ages 34, 30, 28, 23, and 16, four living in Alaska and one in Australia.

¶24 Father testified on providing financial support for his family. When he was released from prison in 2010 he attended school and started his own paralegal service typing motions and doing legal research for attorneys, and working for a labor service. He testified he could work as paralegal typing briefs when the children were asleep.

¶25 He explained his business he described as a "legal broker." This involved people telephoning him for legal advice. People "would have questions for me regarding counsel, are they receiving effective representation . . . [a]nd I'd point to the statute...[a]lso I would point them to certain case law that would enable them to determine whether counsel was effectively representing them when people would call me." He also explained he would assist them in doing legal research by showing them how to use WestLaw. He stated he would go to the courthouse and "pass out my flyers and stuff and I would meet with people and I would talk to them." Father testified he would refer cases to a certain lawyer, and he had an agreement with this lawyer which provided father could do the "paralegal work" the cases required. He enjoyed being at the Oklahoma County courthouse from eight in the morning until five in the afternoon "talking to people about their cases and trying to help them and things like that . . . [and] doing scout work" for a certain lawyer. He explained he was working primarily as a laborer when the children were taken into custody because he had not found a lawyer to employ him to work on a full-time basis.

¶26 Father testified the day of trial was the first time he had heard any complaint from anyone about his children being dirty, unkempt, or given inappropriate care. He also testified that when the joint response of police and DHS appeared at his hotel residence one of their concerns was an allegation he kept his children in car seats for extended periods of time. He stated he would not allow his children to be strapped into car seats for an extended period of time. He also stated his children would not have tolerated being strapped into car seats for an extended period of time. He testified he would never again use the two women caregivers he previously used. Father also testified that during the child safety meeting he was told by DHS it had concern for the children due to inappropriate caregivers, and a dirty and unkempt home.

¶27 He testified it was inappropriate for him to bathe his two-year-old and three-year-old daughters, and bathing his daughters was a duty of the two women he requested to be caregivers for his children. Father's relationship with these two women and if they possessed an employment status or received payment from father for providing child care was not specified in the testimony. On cross examination he testified he telephoned every day for one of the women to come to his room to bathe his daughters during the time their mother was in the county jail. He testified he planned to have his two sisters to bathe his daughters when he is released from incarceration in 2021.

¶28 Father testified a statement by a DHS worker was a lie. Father stated he never said the women caregivers were "prostitutes and junkies." When asked how DHS obtained that information, father replied: "Man I have -- I have extensive experience in the courtroom with DHS, and I -- I think he was coached into saying that, my honest opinion." Father also explained that DHS "haven't met their burden of proof to take my children. So the only thing they have is to focus on my character, and to assassinate my character." Father denied he brought soiled clothing for the children to the child safety meeting. He testified he never brought clothes to the child safety meeting. He testified he telephoned a third party and requested she go to Walmart and buy new clothing for the children, and those clothes were brought to the meeting. He stated he had an opportunity to bring clothes from home for the children.

¶29 He denied the children had missed necessary immunizations. He stated mother kept the immunization cards in her purse, and he did not go with the family for the immunizations because he did not like needles or to observe the children upset. Father stated he intended to have the youngest child "caught up" with required immunizations before the child entered daycare. Father testified none of the children were in daycare. Father recalled the DHS witness and agreed DHS stated it couldn't locate any immunization records for his children. Father's response on this issue was essentially he did not know why the DHS witness made this statement.

¶30 Counsel for the children questioned father on his trouble remembering the birthdays of two of the three children, and father's good memory on the details of his former military service in the U. S. Navy several years ago, his memory of the three hotels and mobile home park he and the children used as residences prior to his incarceration, and legal cases father uses and cites from memory as a paralegal. Father testified the DHS custody of the children had "destabilized" his children. Father stated he thought the children had "issues" caused by the DHS custody. He also stated he wanted his children to remain in custody until his expected release in 2021.

¶31 Father testified his probation was revoked because of his non-compliance with the conditions of his probation which included offender treatment classes and taking a polygraph. He testified his probation originated from a criminal conviction on a no contest plea to rape in the first degree. The plea occurred in February 2008, and he had since commenced a habeas corpus proceeding in a U. S. District Court challenging that plea and conviction. The federal proceeding had not been completed at the time of his testimony. He testified he was waiting on a disability check to pay for the polygraph and classes. He also testified one probation officer had provided him with additional time to take the polygraph and classes.

¶32 Father testified on his plans for the future. He expects to be released from prison in 2021, and he plans to continue his paralegal education and raise his children. He plans to provide housing for his children: "I'm going to apply for my disability, and I have housing that would be set up for me upon my release, once my disability gets -- well its already approved, but once I get reinstated, I have a couple -- a couple of places that I have in place for housing." He expected to receive assistance in obtaining a place to live with his family which satisfied limitations imposed by his registration as a sex offender. He also explained he was "going for my disability for the military." He is on a waiting list for parenting classes while in prison. He will be on probation for five years upon his expected release in 2021.

¶33 He stated he has a relative who was then twenty-three years old and she would stay with the family when he is released from prison and she would be a caregiver for his children. He said he had an older daughter living in Alaska and she would move to Oklahoma and help care for the children. He stated his relatives did not help him care for his children prior to being taken into custody because at that time he had a vehicle, food, and everything needed for the children, and so he did not need any help. He then explained his criminal convictions should have nothing to do with whether he cares for his children. None of his relatives he identified for helping him in the future testified at his trial.

¶34 He stated he had a support group in prison and he was on his medication with positive effects. He said he would not need a support group when he is released, and he would not be in the presence of people encouraging his bad behavior. He identified the mother of his children as a person encouraging his bad behavior before he was incarcerated. Father was asked if he now understands "how the nature of your conviction and the terms of your probation and the reasons why there was a joint response at your home relate in any way whatsoever to your ability to care for your children in the future?" Father responded "No, I don't -- I don't see how -- I don't understand how that would relate to me to care for my -- I've cared for them before."

¶35 The petition to terminate alleged domestic violence. Father testified no domestic violence occurred involving mother. Later in the trial he was questioned concerning his misdemeanor conviction for domestic violence, assault and battery, against the mother. He response was: "I can't recall this incident because this incident never happened. It was a misdemeanor. And I as I told the investigator that I did not -- I did not do this. This is what was alleged, but I did not do this, this act." Father agreed he had been convicted and had signed a plea for pleading guilty to the domestic violence. He explained his prior testimony as being correct because there had been no domestic violence at the time of the petition to terminate, and the conviction related to events in January 2017. He stated he pled guilty "to roll everything with my probation because I wanted to go to prison" and not "stay in the county jail and fight these charges."

¶36 Father testified his hitting the biological mother of the children did not impact his ability to safely care for the children in the future. He testified his restrictions on living near a school or park would impact his children concerning walking to a school or park, but another family member could take them to the park, and "they have a bus route, they can catch a bus to school." He then stated the special supervision conditions of his probation are the general provisions every sex offender must sign, but "most of these conditions aren't applicable to me."

II. Appeal and Review

¶37 A court shall not terminate the rights of a parent to a child unless the child has been adjudicated to be deprived either prior to or concurrently with a proceeding to terminate parental rights; and termination of parental rights must be in the best interests of the child.[8] If the court finds that the factual allegations in a petition filed by the state alleging that a child is deprived are supported by a preponderance of the evidence, and the allegations are sufficient to support a finding that the child is deprived, and it is in the best interests of the child that the child be declared to be a deprived child and made a ward of the court; then the court shall sustain the petition, and shall make an order of adjudication finding the child to be deprived and shall adjudge the child as a ward of the court.[9]

¶38 On appeal from an order declaring a child deprived, the Supreme Court will affirm the trial court's findings if they are supported by competent evidence.[10] When the State terminates parental rights the State must support its allegations for termination with clear-and-convincing evidence.[11] This Court does not re-weigh the evidence, but determines if the evidence for termination "is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven."[12] Father's first assignment of error challenges the sufficiency of the evidence to adjudicate his children as deprived, and we review using the competent-evidence standard.

¶39 Father denied making any statement characterizing his choice of caregivers as prostitutes and junkies, and he accused the DHS worker of lying at trial. This issue did not first arise from testimony at trial. The affidavit in support of emergency removal filed in 2016 states it was reported father had been leaving the children with drug users and prostitutes.

¶40 Father attempted to ameliorate a negative legal result of a jury choosing to believe the statement by the DHS witness concerning his parental choice of caregivers. He stated he had known one of the women for two years with no negative issues, he did not have the resources or authority to perform background checks on the women, he surreptitiously watched them care for his children to make sure they were proper caregivers, and he would never again use these same caregivers. Further, that he would use available family members as caregivers in the future. Mother was in the county jail, father was working during the day, and father was making the decisions on who would provide care to his children while he worked away from the home. He testified he had family members residing locally but he did not ask for their assistance. He testified the DHS had previously offered daycare assistance but he did not ask for daycare assistance.

¶41 There is little doubt an adult providing simultaneous child care to a three-year-old child, a two-year-old child, and ten-month-old child would cause, or contribute to, an increased risk of harm to the children if the adult uses and abuses an illicit drug. One of the women had previously had her parental rights terminated. The jury could have believed the testimony of the DHS witness concerning the father's reported character assessment of his selected caregivers, and concluded the father could have made a different decision and utilized adult family members or the DHS assistance for childcare without creating this risk of harm. The trial court's finding the home was unfit due to inappropriate caregivers is supported in the evidence.

¶42 Father testified the two oldest children had their immunizations from the local public health department, and the youngest child needed to be "caught up" on his immunizations. The DHS employee stated he could not find any records for immunizations given the children. Father testified he knew his oldest child needed speech therapy before they were taken into custody, but he was waiting until a later date to obtain therapy for her. The DHS had provided therapy for this child for over two years by the time of trial, and she was successfully attending kindergarten but still needed additional therapy. Father testified his middle child talked to him, but not strangers and this was her normal, and her behavioral issues were the fault of DHS. He also testified he had similar issues as a child but he overcame the issues as he grew older. He implied the issues relating to his two oldest children were like him (i.e., with a genetic cause) and the issues would be overcome with the children growing older.

¶43 A parent's failure to provide immunizations and medical care for a serious condition may be used to show medical neglect.[13] The same may be said of a parent's conscious decision to not provide age-appropriate speech therapy care necessary for a child to communicate with others. The trial court's finding father's home was unfit for a failure to provide for the children's physical and mental well-being is supported by the evidence.

¶44 Father testified he provided a stable home for his children and residing in four locations in three years was not destabilizing for his children. He also testified he did not see any connection between fulfilling conditions of his probation and caring for his children in a stable home. He stated mother did not work, and he was the primary caregiver for the children as well as providing finances for them by his employment. He also stated he did not work all of the time during the day and could watch the children during the day as well. He also explained his "disabilities kind of flared up once in awhile and I couldn't work as consistent as I wanted to." He testified he needed to help watch the children at home because their mother needed help. His children needed him to fulfill his conditions of probation so he would not be sent back to prison. They needed him to be employed for their financial assistance and they needed his physical presence to provide necessary parental care young children need.

¶45 Father argued there was no domestic abuse prior to the children being taken into DHS custody, and the assault did not occur in the presence of the children. The petitions filed by the State alleged domestic abuse. The evidence of abuse the State used was father's conviction for an assault which occurred in January 2017. This assault was was not used a ground to terminate his parental rights, but as a ground to show deprived status of the children, i.e., their status of being in a family where their father physically assaulted their mother. This domestic abuse assault was committed by father against mother during the time she was trying to follow court orders and obtain custody of her children.

¶46 When a petition is filed and alleges children are deprived due to domestic violence between their mother and father, it is not error for the trial court to consider one of the parent's criminal conviction for domestic abuse assault against the other parent when that assault occurs during the pendency of the deprived proceeding.

¶47 The trial court found the home of the father was unfit due to his mental health. Father testified when his disabilities flare up "once in awhile" he cannot work as much as he desires. This finding is the least supported from reading a written record. Testimony did not link his mental health to an unfit home except in one limited circumstance. Father testified he could not perform as the caregiver he would like to be when he was waiting on his disability check. He testified he was waiting on a disability check "so I could provide a stable residency" and rent an apartment. The family did not live in an apartment. He stated his parole revocation occurred because he was waiting on a disability check to pay for a polygraph and treatment classes. His parole was revoked for not taking the required classes and polygraph.

¶48 The trial court also determined the father's home was unfit due to a threat of harm. The court did not tie this finding to a specific threat of harm. Adults know that children are by nature, as well by law, incapable of caring for themselves and making those decisions which are vital to their well-being and survival.[14] Parents are given the responsibility to make decisions which provide proper and necessary care for their children.[15] Parental decisions in the form of either an act or an omission to act may be used by the State to show the decisions caused or contributed to a deprived status.[16] The State must step in and become involved in the parent-child relationship when a parental decision causes, or contributes to, a risk of harm to a child which is legally cognizable.[17] The risk of harm assessment may include several factors, including but not limited to, the nature of parental care, supervision, cleanliness of the child and the home, and the nourishment and medical attention provided to the child.[18]

¶49 We affirm the trial court's determination the father's home was unfit and the children deprived.

¶50 Father objects to termination of his parental rights. He argues the State failed to show his incarceration would harm the children. Father references 10 A O.S.Supp.2015 § 1-904(B)(12), which allows termination of a parent's rights when the parent is incarcerated and continuation of the parental relationship would result in harm based upon the following nonexclusive factors.

a. the duration of incarceration and its detrimental effect on the parent/child relationship,
b. any previous convictions resulting in involuntary confinement in a secure facility,
c. the parent's history of criminal behavior, including crimes against children,
d. the age of the child,
e. any evidence of abuse or neglect or failure to protect from abuse or neglect of the child or siblings of the child by the parent,
f. the current relationship between the parent and the child, and
g. the manner in which the parent has exercised parental rights and duties in the past.

10 A O.S.Supp.2015 § 1-904(B)(12).

¶51 Counsel argued the father had not been successful on probation in the past and upon his release he would again be on probation for five years. Father avoided visiting the children when a warrant had been issued for his arrest. The testimony and record show father commenced writing letters to his children on a regular basis after being directed to do so by the court in October 2018, two months after the amended petition to terminate had been filed and three months before his trial. Father had been incarcerated one year and nine months at the time he commenced writing letters. He testified no one at the DHS told him to write letters to his children or provided him an address for contacting the children. He also testified at trial he had experience in working with the DHS.

¶52 The ages of the children in 2021 will be eight-years-old, seven-years-old, and six-years-old. The six-year-old has not lived with his father since the child was ten-months-old. The oldest child was at one time temporarily placed with a maternal relative, although we lack information on a current placement there is no indication of placement of the children with father's relatives.

¶53 We have noted some incarcerated parents are able to make suitable arrangements, financial and otherwise, for the care and custody of their children while the parent is incarcerated, and often this includes members of the parent's extended family with a continuation of family ties during incarceration.[19] Some courts have stated impecuniousness should not be the basis for taking a child from a parent.[20] We agree.

¶54 Father desires the children to be in the custody of DHS until he is released from prison. He is counting on assistance for obtaining a place to live, government financial support for himself and his children, and relatives he hopes will help him with daily tasks necessary for raising the children. He testified he does not currently have the assistance he described, the relatives he indicated would help him are not taking care of the children while he is incarcerated, and one of the relatives he identified as helping him resides in Alaska. Father wants his children when he is released from custody. Father testified he has learned from his mistakes and his care of his children will be different when released from prison. On the other hand, opposing counsel argued father had testified he did not do anything wrong, and father's testimony on what life will be like for the children upon his release is merely a continuation of deprived status and residing in an unfit home.

¶55 We agree evidence of harm was shown sufficient for the jury to terminate father's parental rights while incarcerated.

¶56 Parental rights may be terminated as to adjudicated deprived children when in the bests interests of the children and the parent has been convicted of rape.[21] The jury determined this ground was present and sufficient for termination of father's parental rights. Father's appellate brief does not challenge this ground directly, but indirectly by arguing (1) the evidence on the best interests of the children did not support termination, and (2) the trial court allowed prejudicial evidence relating to Father's prior criminal convictions in addition to the mere fact of the convictions. We have repeated much of the evidence herein and its nature is sufficiently clear and convincing for the determination made by the jury.

¶57 Father's trial counsel filed a motion in limine. The motion involved three categories, (1) his criminal history, (2) juvenile adjudications and municipal citations, and (3) hearsay issues. On the category of past criminal convictions, the State argued the father's past criminal convictions were relevant to the ground of termination due to incarceration and the best interests of the children. The trial court sustained father's motion as to prior convictions which were not listed in the State's petition to terminate. The trial court stated it would allow evidence concerning two convictions, rape in the first degree and a conviction in the State of Alaska because they were listed in the petition to terminate. The trial court ruled the other convictions could be used for impeachment purposes. When the issue came up on the last day of trial the Court stopped one of the lawyers from speaking and bringing up additional criminal convictions: "The Court has already ruled on the motion in limine prepared by the defense regarding the criminal history of the father and that we're going to stick specifically to what's alleged in the petition unless father impeaches himself or there's an issue of credibility . . . [And the State may not backdoor this issue] . . . So at this point in time the Court is not going to allow the State to present -- or put criminal history into the record, will not be presented as evidence to the jury."

¶58 Father's brief argues the trial court improperly allowed admission of exhibits and cites a portion of the transcript at the end of the trial when counsel for father made objections to exhibits previously admitted. Counsel objected to Exhibit Nos. 3-9 inclusive. Exhibit Nos. 3-7 relate to father's rape conviction.[22] Exhibit Nos. 8 and 9 relate to father's misdemeanor conviction for domestic abuse. Counsel agreed to redact social security numbers. The trial court also agreed with father's counsel and stated specific case numbers referring to other criminal convictions would be redacted.

¶59 Father's counsel objected to the number of instruments and their multiple pages from the rape case. Father testified he was challenging his conviction in federal court and it did not count because it was coerced. Opposing counsel used pages other than those showing the mere fact of conviction when questioning father relating to his signature and certain responses and findings relating to a free and voluntary plea. We need not reach the issue pressed by father, that a single page from a document showing a conviction is all which should be allowed for the jury to see. Father testified his plea of no contest to two counts of rape in the first degree was invalid because of a coerced plea, and he opened up the issue of the circumstances of his plea. The last two exhibits, nos. 8 and 9, related to his domestic abuse conviction, and they were not admitted until after father testified he did not commit domestic abuse.

III. Conclusion

¶60 The District Court's judgment adjudicated the children deprived as to father. The evidence is sufficient to support the trial court's adjudication. The jury determined father's parental rights should be terminated as to each of the individual three children. The District Court's judgment terminated father's parental rights. No assigned error is a ground for reversing the judgment, and the evidence is sufficient for the judgment of the trial court. District Court's judgment is affirmed.

¶61 ALL JUSTICES CONCUR.

FOOTNOTES

[1] Father was represented by a different lawyer in the District Court.

[2] The attorney for the children, Jana Harris, Oklahoma City, Oklahoma, joined the brief filed by the State of Oklahoma.

[3] 10A O.S.Supp.2015 § 1-4-904 (A) & (B) (8) (b):
A. A court shall not terminate the rights of a parent to a child unless:
1. The child has been adjudicated to be deprived either prior to or concurrently with a proceeding to terminate parental rights; and
2. Termination of parental rights is in the best interests of the child.
B. The court may terminate the rights of a parent to a child based upon the following legal grounds: . . .
8. A finding that the parent has been convicted in a court of competent jurisdiction in any state of any of the following acts:...b. rape, or rape by instrumentation....

[4] 10A O.S.Supp.2015 § 1-4-904 (A) & (B) (12):

A. A court shall not terminate the rights of a parent to a child unless:
1. The child has been adjudicated to be deprived either prior to or concurrently with a proceeding to terminate parental rights; and
2. Termination of parental rights is in the best interests of the child.
B. The court may terminate the rights of a parent to a child based upon the following legal grounds: . . .
12. A finding that the parent whose rights are sought to be terminated is incarcerated, and the continuation of parental rights would result in harm to the child based on consideration of the following factors, among others:
a. the duration of incarceration and its detrimental effect on the parent/child relationship,
b. any previous convictions resulting in involuntary confinement in a secure facility,
c. the parent's history of criminal behavior, including crimes against children,
d. the age of the child,
e. any evidence of abuse or neglect or failure to protect from abuse or neglect of the child or siblings of the child by the parent,
f. the current relationship between the parent and the child, and
g. the manner in which the parent has exercised parental rights and duties in the past.
Provided, that the incarceration of a parent shall not in and of itself be sufficient to deprive a parent of parental rights;

[5] 10A O.S.2011 § 1-4-603:
A. If the court finds that:
1. The factual allegations in a petition filed by the state alleging that a child is deprived are supported by a preponderance of the evidence;
2. Such allegations are sufficient to support a finding that the child is deprived; and
3. It is in the best interests of the child that the child be declared to be a deprived child and made a ward of the court, then the court shall sustain the petition, and shall make an order of adjudication finding the child to be deprived and shall adjudge the child as a ward of the court.
B. The order of adjudication shall include a statement that advises the parent that failure to appear at any subsequent hearing or comply with any requirements of the court may result in the termination of parental rights to the child.
C. When a child has been adjudicated deprived, the court shall enter a dispositional order pursuant to the provisions of Section 1-4-707 of this title.
D. When a child has been adjudicated deprived, the parent or other legal custodian shall register with the court clerk within two (2) days of the adjudication and provide a valid, current address or other place where the parent or other legal custodian may be served with a summons. In the event that the address or place where the parent or legal custodian may be served a summons changes during the course of the litigation, the parent or other legal custodian shall have the obligation of filing a change of address form with the clerk. In the event that an amended petition or motion is filed, the address listed on the form of the court clerk shall constitute the last-known address of the parent or other legal custodian unless the state has actual knowledge of the parent or other legal custodian's location.

[6] An appellate brief may amend assignments of error raised in a petition in error provided they were preserved in the trial court. Lay v. Ellis, 2018 OK 83, n. 3, 432 P.3d 1035 (petition in error will be deemed amended to include errors set forth in the propositions in the brief-in-chief, provided that in no event may the appeal be broader in scope than allowed by [Okla.Sup.Ct.] Rule 1.26(a)); In re Adoption of M.J.S., 2007 OK 44, n. 12, 162 P.3d 211 ("Assignments of error not argued or supported in the brief with citations of authority are treated as waived.").

[7] The transcript is not clear when counsel and witness addressed concepts of scientific method and scientific proof in the context of causation and human behavior if they were attempting to address general causation versus specific causation, or the application of Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in the context of an opinion in a social science and whether any inherent methodological limitations are, or should be, judicially recognized as applicable for the particular circumstance of human behavior discussed. See, e.g., U. S. v. LaVictor, 848 F.3d 428, 443-444 (6th Cir. 2017) citing U. S. v. Simmons, 470 F.3d 1115, 1122 (5th Cir. 2006), and Beauchamp v. City of Noblesvile, 320 F.3d 733, 745 (7th Cir. 2003) (discussion of expert testimony allowed when concerning human behavior not supported by exhaustive statistical evidence but by the expert's general research and history of personal interactions with people possessing the behavior); Christian v. Gray, 2003 OK 10, ¶ 21, 65 P.3d 591, 602 (general causation versus specific causation discussed); The Federal Judicial Center, Reference Manual on Scientific Evidence, 229-276, 231 (2d ed. 2000) (discussing surveys "used to describe or enumerate objects or their beliefs, attitudes, or behavior of persons or other social units").

[8] See 10A O.S.Supp.2015 § 1-4-904 (A), supra, at note 4.

[9] See 10A O.S.2011 § 1-4-603, supra, at note 5.

[10] In re J.D.H., 2006 OK 5, ¶ 4, 130 P.3d 245, 257.

[11] In re S.B.C., 2002 OK 83, ¶ 5, 64 P.3d 1080, 1082.

[12] Matter of B. K., 2017 OK 58, ¶ 35, 398 P.3d 323, 330.

[13] In re K.M., 164 A.3d 945, n.4, 948 (D.C.2017) (one type of medical neglect is shown when a parent failed to have proper immunizations for a child and failed to treat a serious respiratory condition).

[14] Matter of Daniel, 1979 OK 33, 591 P.2d 1175, 1178.

[15] Matter of A.D.B., 1991 OK 96, 818 P.2d 483, 487 (discussing the sufficiency of the termination petition, Matter of Daniel, supra, at note 14, and sufficiency of a petition for a dependency adjudication where one of the allegations was parents had been unable to provide proper and necessary care).

[16] In re A.L.F., 2010 OK 59, ¶ 4, 237 P.3d 217, 219 (trial court order was affirmed on appeal and it found children's deprived status was caused by or contributed to by the acts or omissions of a parent).

[17] Matter of Daniel, 1979 OK 33, 591 P.2d at 1177.

[18] In re Moore, 1976 OK 191, 558 P.2d 371, 374--375.

[19] In Matter of Christina T., 1979 OK 9, 590 P.2d 189, 192.

[20] New Jersey Div. of Youth and Family Services v. P.W.R., 205 N.J. 17, 11 A.3d 844 (2011).

[21] See 10A O.S.Supp.2015 § 1-4-904 (A) & (B) (8) (b), supra, at note 3.

[22] Exhibit No. 3, (plea of no contest summary of facts to the first degree rape charge); Exhibit No. 4, (plea of no contest, sentence on plea); Exhibit No. 5, (sex offender conditions on probation); Exhibit No. 6, (judgment and sentence on rape conviction); Exhibit No. 7 (revocation of probation).






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1991 OK 96, 818 P.2d 483, 62 OBJ 2878, A.D.B., Matter of
Discussed
 2002 OK 83, 64 P.3d 1080, IN THE MATTER OF S.B.C.
Discussed
 2003 OK 10, 65 P.3d 591, CHRISTIAN v. GRAY
Discussed
 2006 OK 5, 130 P.3d 245, IN THE MATTER OF: J.D.H.
Discussed
 2007 OK 44, 162 P.3d 211, IN THE MATTER OF THE ADOPTION OF: M.J.S.
Discussed
 2010 OK 59, 237 P.3d 217, IN THE MATTER OF A.L.F.
Discussed
 1976 OK 191, 558 P.2d 371, MATTER OF MOORE
Discussed
 1979 OK 9, 590 P.2d 189, MATTER OF CHRISTINA T.
Discussed
 1979 OK 33, 591 P.2d 1175, MATTER OF DANIEL, DEBORAH AND LESLIE H.
Discussed at Length
 2017 OK 58, 398 P.3d 323, IN THE MATTER OF B.K.
Discussed
 2018 OK 83, 432 P.3d 1035, LAY v. ELLIS
Discussed


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA