OSCN Found Document:IN THE MATTER OF: M.R.

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 IN THE MATTER OF: M.R.
2024 OK 28
Case Number: 120910; Comp. w/120844; 121060
Decided: 04/23/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 28, __ P.3d __

 

 

IN THE MATTER OF: M.R., S.R., E.R., and N.R., adjudicated deprived children;

VICTORIA RODRIGUEZ, Appellant,
v.
STATE OF OKLAHOMA, Appellee.

 

IN THE MATTER OF: M.R., S.R., E.R., and N.R., adjudicated deprived children;

EVERARDO RODRIGUEZ, Sr., Appellant,
v.
STATE OF OKLAHOMA, Appellee.

 

APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY;

Honorable Kaitlyn G. Allen, District Judge 

¶0 The appellants are the parents of four children who were adjudicated deprived and, after a jury trial, the trial court terminated their parental rights. Each parent filed a separate appeal of their respective termination orders and both are considered within this opinion. A separate appeal, unrelated to the parties in this case, was made a companion due to a first impression issue concerning the Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U.S.C. §§ 1901-1963, presented in Case No. 120,844, and Victoria Rodriguezes' appeal. Case No. 120,844 is not addressed within this opinion. All three appeals were retained by this Court. We hold that Victoria Rodriguez lacks standing to challenge the constitutionality of ICWA and that the trial court's failure to apply the heightened burden of proof neither violated her constitutional right to equal protection under the law nor constituted legal error. As to the remaining issues raised on appeal, we hold that the trial court's orders terminating parental rights should be affirmed.

PREVIOUSLY RETAINED ON THIS COURT'S OWN MOTION;

DISTRICT COURT AFFIRMED

Christian Henry, Attorney at Law, Oklahoma City, Oklahoma for Appellant, Victoria Rodriguez

Jessica Brown, Resurge Legal, PLLC, Oklahoma City, Oklahoma for Appellant, Everardo Rodriguez, Sr.

Jaclyn Rivera, Assistant District Attorney, Oklahoma County, Oklahoma City, Oklahoma for Appellee

William R. Hauser, Oklahoma County Public Defender, Oklahoma City, Oklahoma for children

COMBS, J.:

FACTUAL AND PROCEDURAL BACKGROUND

¶1 This opinion involves two appeals, one initiated by Victoria Rodriguez (Mother), in Case No. 120,910, and one initiated by Everardo Rodriguez, Sr. (Father), in Case No. 121,060. The orders appealed are two orders terminating parental rights following a jury trial; one for Mother in her appeal[1] and one for Father in his appeal. Both orders arise from the same termination proceedings in The District Court of Oklahoma County, State of Oklahoma, Juvenile Division, Case No. JD-2022-149. The appeals along with another unrelated appeal, as to parties, in Case No. 120,844, were made companion cases. All three cases were previously retained by this Court. Case No. 120,844, is not the subject of this opinion but has some similar issues addressed for the first time by this Court.

¶2 The matter concerns the termination of parental rights of Victoria Rodriguez and Everardo Rodriguez, Sr., to their four children, two girls, M.R. and S.R., and two younger boys, E.R., and N.R. The termination is based upon allegations of heinous and shocking sexual abuse against M.R. by Father over approximately a two-year period and failure to protect the children from heinous and shocking sexual abuse by Mother.

¶3 On or about July 11, 2022, M.R. who was a few days away from her fifteenth birthday, disclosed to her aunt she had been sexually abused by Father since she was 13 years old. She alleged the abuse occurred up to three times a week over this period. Mother was told of the abuse and took M.R. to Oklahoma Children's Hospital for an examination. Dr. Stockett examined M.R. and although she did not find any physical signs of sexual abuse she later testified that such signs would not necessarily be apparent in someone like M.R. who is post-pubertal and according to M.R. the last abuse occurred weeks earlier in June 2022. Dr. Stockett concluded from M.R.'s descriptions that she had been abused. Officer Griggs of the Del City Police Department was contacted by Dr. Stockett. Officer Griggs met with M.R. and Mother about an hour after M.R.'s examination. M.R. was crying and upset and he found Mother to be detached and not comforting to M.R. Mother did not want to believe M.R.'s allegations and was more concerned about being at her house rather than protecting the children. Officer Griggs was concerned that Mother would not leave the house.

¶4 Mother took the children to a friend's house. The next day, July 12, 2022, an Oklahoma Department of Human Services (DHS) employee in the Child Protective Services division, Brianna Hill, went to the friend's house in order to attempt to instigate a safety plan. The purpose of the safety plan is to allow the children to be voluntarily housed in a safe place without court involvement while DHS finishes its investigation. It involves finding a home with a relative or friend of the family who can act as a safety plan monitor. Hill spent nearly four and one-half hours at the house while multiple persons were contacted to act as a safety plan monitor. Hill informed Mother what the difference would be if they could not find a safety plan monitor. However, knowing a court would get involved if they could not find one, Hill observed Mother calling M.R. a liar while on the phone with the potential safety plan monitors. She would tell them that M.R. just made up the allegations because she was upset with her father. Father also told Hill that M.R. was a pathological liar. Mother stated that she did not have concern about Father being with the kids and as soon as DHS was done she planned to take the children back to her home. None of the potential safety plan monitors volunteered. Mother made other comments defending Father rather than M.R., including that she could not understand why Father would have sex with M.R. when he could have sex with her. Not finding a safety plan monitor, Hill pursued court involvement and the children were placed in foster care. Mother returned to live with Father.

¶5 A hearing was held and an Emergency Custody Hearing Order was entered on July 14, 2022. Under the "reasonable efforts" section of the form/order the court determined continuation of the children living in their home was contrary to the health, safety or welfare due to, "allegations of lack of proper parental care/guardianship, threat of harm, failure to protect, and sexual abuse." The court also determined that reasonable efforts have been made by DHS to prevent removing the children, noting DHS attempted to find a safety monitor but was unable to identify one and there are concerns the mother does not believe the sexual abuse disclosure. The two boys were placed together in a traditional foster home, while M.R. and S.R. were at first placed separately but soon were placed together in a different foster home. The court also determined The Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U.S.C. §§ 1901--1963 (ICWA) does not apply to these children.

¶6 The State filed its petition on July 21, 2022, wherein it pursued termination of parental rights as to Mother for failure to protect from heinous and shocking sexual abuse and as to Father for heinous and shocking sexual abuse. A jury trial began on October 31, 2022, and ended on November 4, 2022. At the close of the evidence, the court determined that by a preponderance of the evidence all four children should be adjudicated deprived. The jury deliberated and returned a verdict finding it was in the best interests of all four children to terminate the parental rights of Mother for failure to protect from heinous and shocking sexual abuse and of Father for abuse of any child that was heinous and shocking. Two orders terminating parental rights were entered on November 4, 2022. It is from these orders that Mother and Father appeal.

STANDARD OF REVIEW

¶7 In parental termination cases, the State must show by clear and convincing evidence that the child's best interest is served by the termination of parental rights. In the Matter of C.G., 1981 OK 131, ¶17, 637 P.2d 66, 70-71. Our case law provides that clear and convincing evidence is the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. In the Matter of the Adoption of L.D.S., 2006 OK 80, ¶11, 155 P.3d 1, 4, quoting In re C.G., 1981 OK 131, ¶17 n. 12, 637 P.2d 66, 71 n. 12. This standard of proof "balances the parents' fundamental freedom from family disruption with the state's duty to protect children within its borders." In the Matter of Adoption of L.D.S., 2006 OK 80, ¶11, 155 P.3d 1, 4, quoting In re C.G., 1981 OK 131, ¶17, 637 P.2d at 70.

¶8 Although the burden of proof is by a preponderance of the evidence when a court adjudicates children are deprived and the appellate court shall affirm the trial court's findings if supported by competent evidence, Matter of L.M.A., 2020 OK 63, ¶¶37-38, 466 P.3d 559, 569, the burden shifts at the termination of parental rights phase of trial. Our review on appeal must find the presence of clear and convincing evidence to support the factfinder's decision as to termination of those rights. In the Matter of S.B.C., 2002 OK 83, ¶7, 64 P.3d 1080, 1082. We must canvass the record to determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. Id. ¶6, 64 P.3d at 1081. Our appellate review, however, does not require a re-weighing of the evidence presented at trial. Daniels v. State (In re C.D.P.F.), 2010 OK 81, ¶6, 243 P.3d 21, 24. Where a party makes no objection to the trial court but raises the issue on appeal, the authority of the appellate court is severely limited. Farris v. Masquelier, 2022 OK 91, ¶13, 524 P.3d 942, 948. However, an issue is still reviewable for fundamental error even when no exception has been taken. Id. Fundamental error occurs when a trial court fails to accurately state the law and compromises the integrity of the proceeding to such a degree that the error has a substantial effect on the rights of one or more of the parties. Id. ¶14, 524 P.3d at 948.

ANALYSIS

I. 120,910 Mother's Appeal

A. ICWA is not applicable to these proceedings.

¶9 For her first argument, Mother argues that ICWA denies her equal protection under the law in violation of the Fourteenth Amendment to the U.S. Constitution and of Article II, Section 7 of the Oklahoma Constitution. Appellant's Br. 2--3 & n.10. On one hand, Oklahoma law generally places the burden on the State to prove by clear and convincing evidence that the statutory basis for terminating parental rights exists and that the child's best interests are served by terminating parental rights. Id. at 1--2 & n.1 (citing Daniels v. State (In re C.D.F.P.), 2010 OK 81, ¶5, 243 P.3d 21, 23; In re C.G., 1981 OK 131, ¶17, 637 P.2d 66, 71); accord OUJI-Juv. No. 2.5. But as Mother points out, § 1912(f) of ICWA mandates that "[n]o termination of parental rights may be ordered in such [involuntary child custody] proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the custody of the [Indian] child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Id. at 3 (quoting 25 U.S.C. § 1912(f) (2018)). Thus, Mother argues that "the law provides for additional protections for Indian children" that it does not provide for "other similarly situated children." Id. As a solution, Mother proffers "not that ICWA should be held unconstitutional in and of itself, but that all families similarly situated should be entitled to the same protections as any other family, Native American or otherwise." Id. at 5. In other words, she asks that we reverse the trial court's judgment terminating her parental rights insofar as the trial court failed to apply the heightened burden of proof.

¶10 To her credit, Mother mentions that the Oklahoma Court of Civil Appeals (COCA) has rejected this argument in Knight v. State (In re M.K. & L.K.), 1998 OK CIV APP 118, 964 P.2d 241. Appellant's Br. 4. Nevertheless, she argues that we should find Knight unpersuasive because COCA opinions are nonprecedential and because COCA was too focused on protecting Native American families and failed to consider the effect ICWA has on non-Indian families. Id.

¶11 In response, the State makes three arguments.

¶12 First, the State points out that ICWA does not raise the burden of proof to "beyond a reasonable doubt" for anything but "the sole finding of whether 'continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.'" Appellee's Br. 3 (quoting 25 U.S.C.A. § 1912(f)). In other words, the State is reminding us that its burden of proof on each statutory element set forth in 10A O.S. 2021, § 1-4-904(B)(9) would be clear-and-convincing proof regardless of whether ICWA applies and that the heightened beyond-a-reasonable-doubt burden of proof only applies to one additional element that the State must prove in cases where ICWA does apply. See Stubbs v. Pearson (In re Adoption of G.D.J.), 2011 OK 77, ¶37 n.25, 261 P.3d 1159, 1169 n.25 ("[T]he heightened standard of proof only applies to the factual determination required by 25 U.S.C. § 1912(f) . . . and the state law mandated burden of proof of 'clear and convincing evidence' applies to all other state law requirements for termination." (citing Stephens v. State (In re J.S. & M.C.), 2008 OK CIV APP 15, ¶4, 177 P.3d 590, 591)); see also OUJI-Juv. ch. 5, Introductory Note (discussing the "Dual Standard Of Proof for Termination Of Parental Rights" in ICWA cases); OUJI-Juv. No. 5.2 ("The State has the burden of proving beyond a reasonable doubt that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. The State has the burden of proving by clear and convincing evidence all of the other requirements for the termination of parental rights."). Thus, the State seems to be insinuating that the disparate treatment about which Mother complains isn't quite as disparate as she suggests.

¶13 Second, the State argues that COCA's opinion in Knight v. State (In re M.K. & L.K.), 1998 OK CIV APP 118, 964 P.2d 241, rightly decided this issue. Appellee's Br. 4. When legislation categorizes persons based on a suspect class, such as race or national origin, it is subject to strict scrutiny under the Equal Protection Clause--meaning the legislation will only be upheld if it is narrowly tailored to serve a compelling state interest. Anderson v. Eichner, 1994 OK 136, ¶20, 890 P.2d 1329, 1340 (citing Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 16 (1973)). When legislation categorizes persons based on a quasi-suspect classification--such as sex or illegitimacy--it is subject to intermediate scrutiny--meaning the legislation will only be upheld if it is substantially related to an important or substantial state interest. Id. ¶20 n.35, 890 P.2d at 1340 n.35 (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440--41 (1985); Craig v. Boren, 429 U.S. 190 (1976)). But when the categorization is not based upon suspect or quasi-suspect classifications, the legislation is subject only to rational-basis review, meaning it will be upheld if it is rationally related to a legitimate government purpose. Id. (citing Cleburne, 473 U.S. at 440; Dandridge v. Williams, 397 U.S. 471, 485 (1970)). The question here is whether ICWA's classification of children based upon their status as "Indian" is a race-based classification that is suspect. The State contends that Knight properly applied the rational basis test to § 1912(f) of ICWA in keeping with the logic of the U.S. Supreme Court's decision in Morton v. Mancari, 417 U.S. 535 (1974), which held that discrepancies in the treatment of Native and non-Native Americans are not race-based. Appellee's Br. 4. Because "the heightened burden of proof required for termination of a child covered by ICWA is rationally tied to Congress' responsibility for policy towards Indian families," the State asserts that § 1912(f) passes the rational basis test and does not violate a non-Native's equal protection rights. Id. (quoting Knight, 1998 OK CIV APP 118, ¶9, 964 P.2d at 244).

¶14 Third, the State raises arguments that allude to problems with Mother's standing to challenge ICWA. As the State notes, "ICWA does not apply to this current case as the child is not a member of an Indian tribe nor eligible for enrollment in an Indian tribe." Id. Thus, Mother "has failed to indicate why she should be entitled to the protections under ICWA, and under what law that would be required. [She] was afforded all the due process rights and statutory requirements under the law as it is currently written." Id. at 5. Similarly, the State argues that "IWCA [sic] does not apply to this case and [Mother] has failed to cite any authority supporting her claim that she is entitled to the heightened standard. . . . The constitutionality of the Indian Child Welfare Act has no bearing on the current case . . . ." Id.

¶15 Because standing is a threshold issue, see Indep. Sch. Dist. # 52 of Okla. Cty. v. Hofmeister, 2020 OK 56, ¶53, 473 P.3d 475, 498, we will address the State's final argument first. When the issue of standing is raised, the focus is on the party seeking to get her complaint before the court and not on the issues tendered for determination in the case. Democratic Party of Okla. v. Estep, 1982 OK 106, ¶7, 652 P.2d 271, 274. "When standing is placed in issue in a case, the question is whether the person whose standing is challenged, is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." State ex rel. Cartwright v. Okla. Tax Comm'n, 1982 OK 146, ¶6, 653 P.2d 1230, 1232 (quoting Flast v. Cohen, 392 U.S. 83, 99--100 (1968)). This inquiry involves both constitutional limitations[2] and prudential limitations on the exercise of judicial power. See Hendrick v. Walters, 1993 OK 162, ¶5 n.14, 865 P.2d 1232, 1236 n.14 (citing Warth v. Seldin, 422 U.S. 490, 498 (1975)). The constitutional prong of standing requires, at an irreducible minimum, that the party who invokes the court's authority demonstrate "(1) a legally protected interest which must have been injured in fact--i.e., an injury which is actual, concrete and not conjectural in nature, (2) a causal nexus between the injury and the complained of conduct, and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision." Cities Serv. Co. v. Gulf Oil Corp., 1999 OK 16, ¶3, 976 P.2d 545, 547 (citing Toxic Waste Impact Grp., Inc. v. Leavitt, 1994 OK 148, 890 P.2d 906; Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992)); accord Hendrick, 1993 OK 162, ¶5 n.14, 865 P.2d at 1236 n.14 (discussing identical standing requirements imposed upon federal courts by Article III of the U.S. Constitution). The prudential prong of standing addresses itself to the self-restraint that a court may exercise where the claimant seeks adjudication of "abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches" or where the claim itself falls outside "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474--75 (1982); accord Hendrick, 1993 OK 162, ¶ 5 n.14, 865 P.2d at 1236 n.14 ("Generally, the plaintiff can only assert that his own interests and legal rights have been injured, and not those of third parties." (citing Valley Forge, 454 U.S. at 474; Warth, 422 U.S. at 500--01)); Indep. Sch. Dist. No. 9 of Tulsa Cty. v. Glass, 1982 OK 2, ¶10, 639 P.2d 1233, 1237 (stating that an inquiry into standing must reveal, among other things, that "the interest sought to be protected is within the zone of interest to be protected or regulated by the statute in question"); cf. Webb v. Wiley, 1979 OK 119, ¶4, 600 P.2d 317, 319 ("The threshold issue is appellant's [i.e., mother's] standing to assert constitutional rights of the putative father because, ordinarily, constitutional rights are personal and may not be asserted vicariously." (emphasis added) (citing Broadrick v. Oklahoma, 43 U.S. 601 (1973))).

¶16 We need not reach the merits of Mother's claim that she has been denied equal protection under the law because she lacks standing to raise that claim. Even if we assume that ICWA impermissibly categorizes persons based on race and is unconstitutional for violating Mother's equal protection rights, Mother has failed to show that her injury--i.e., the trial court's refusal to apply § 1912(f)'s heightened burden of proof--can "be redressed by a favorable decision" on appeal. Normally, an unconstitutional statute would be invalidated such that it applies to no one. See State ex rel. Tharel v. Bd. of Comm'rs of Creek Cty., 1940 OK 468, ¶6, 107 P.2d 542, 546--47 (discussing the following "elementary principle of constitutional law: 'When a statute is adjudged to be unconstitutional, it is as if it had never been. Rights cannot be built up under it; contracts which depend upon it for their consideration are void; it constitutes a protection to no one who has acted under it, and no one can be punished for having refused obedience to it before the decision was made.'" (quoting 1 Thomas M. Cooley, A Treatise on the Constitutional Limitations 382 (Walter Carrington ed., 8th ed. 1927))). Here, invalidation would mean that § 1912(f)'s heightened burden is void such that no one--including Mother--would reap the benefit of its application, which in turn would result in our affirmance of the trial court's application of the lower burden of proof. Yet Mother is effectively asking us to deem § 1912(f) of ICWA unconstitutional and to amend--rather than invalidate--the statute so that its heightened burden applies to everyone, including her. Such an amendment would be inappropriate insofar as Congress never intended nor contemplated application of § 1912(f)'s heightened burden in cases not involving Native Americans. Cf. Tulsa Exposition & Fair Corp. v. Bd. of Cty. Comm'rs of Tulsa Cty., 1970 OK 67, ¶23, 468 P.2d 501, 507 (stating that severability of an unconstitutionally invalidated provision, which may be viewed obversely as the preservation of the constitutional portions of a statute, depends upon "a probe of legislative intent" and is inappropriate "[i]f the remaining provisions of the Act creates [sic] a result not intended or contemplated" by the legislature); Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 330 (2006) ("[T]he touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature." (internal quotation marks omitted)). Furthermore, this Court cannot grant Mother's requested remedy, as an amendment by the state judiciary of a federal act would violate principles governing both the separation of powers, see In re Anderson, 1996 OK 135, ¶14, 932 P.2d 1110, 1115 (This Court does not sit as a council of revision, empowered to rewrite legislation in accord with its own conception of prudent public policy."); Allgood v. Allgood, 1981 OK 21, ¶19, 626 P.2d 1323, 1327 ("It is the duty of courts to give effect to legislative acts, not to amend, repeal or circumvent them."), and federalism. Consequently, Mother's perceived injury is not redressable by a favorable decision on appeal, and she therefore lacks standing to maintain her equal protection claim on appeal.

¶17 This wouldn't be the first time this Court has found lack of standing due to lack of redressability. In Cities Service Co. v. Gulf Oil Corp., 1999 OK 16, 976 P.2d 545, the trial judge had imposed sanctions upon two defense lawyers after they violated her orders on motions in limine. Id. ¶2, 976 P.2d at 547. The trial judge forbade one lawyer from questioning witnesses and participating in closing arguments, and she forbade the other lawyer from concluding his closing arguments and participating in post-trial proceedings. Id. ¶2 n.1, 976 P.2d at 547 n.1. The trial judge never formally held the lawyers in contempt, nor did she impose monetary fines on them. Id. ¶2, 976 P.2d at 547. The lawyers subsequently sought appellate review of the imposed sanctions, claiming that the trial judge's orders and comments about their behavior being "contemptuous" were reported in the local media and caused harm to their professional reputations. Id. Plaintiff contended that the defense lawyers' interests were not injured, thereby raising the issue of standing. Id. Upon review, this Court determined that the lawyers lacked standing:

[I]t is not necessary today to, and hence we do not, reach the issue whether Funk and Schmidt's interests in their professional reputations are legally protectible because there is no reasonable likelihood that the alleged harm would be redressed by a favorable opinion. Hence, the third component of standing is missing.

. . . .

Assaying standing against the facts disclosed by the record, the lawyers' appeal is in a form which is not capable of judicial resolution. Standing's third component requires there be a reasonable likelihood that the complained of injury will be redressed by a favorable decision. The Court can provide no remedy--other than a meaningless declaration--to the lawyers in this appeal. If the sanction orders constitute reversible error, the only possible remedy would be to order a new trial. This relief, if appropriate under the facts disclosed by the record, would be a remedy available to Gulf Oil Company in its own right and not to the appellants who are non-parties in the litigation below. As a personal right Gulf's lawyers are not entitled to a new trial solely to vindicate perceived damage to their professional reputations.

Id. ¶¶ 8--12, 976 P.2d at 548--49 (footnotes omitted). In a similar vein, Mother lacks standing because "there is no reasonable likelihood that the alleged harm would be redressed by a favorable opinion" and her injury is "not remediable" through a judicial determination that ICWA is unconstitutional. Id. ¶¶8--9, 976 P.2d at 548.

¶18 Similarly, in Haaland v. Brackeen, 599 U.S. 255 (2023), the U.S. Supreme Court found the plaintiffs lacked standing to maintain their claims that ICWA was unconstitutional due to lack of redressability:

Petitioners raise two additional claims: an equal protection challenge to ICWA's placement preferences and a nondelegation challenge to the provision allowing tribes to alter placement preferences. We do not reach the merits of these claims because no party before the Court has standing to raise them. . . .

The individual petitioners argue that ICWA injures them by placing them on "[un]equal footing" with Indian parents who seek to adopt or foster an Indian child. . . . The racial discrimination they allege counts as an Article III injury.

But the individual petitioners have not shown that this injury is "likely" to be "redressed by judicial relief." TransUnion LLC v. Ramirez, 594 U.S. ----, ----, 141 S. Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021). They seek an injunction preventing the federal parties from enforcing ICWA and a declaratory judgment that the challenged provisions are unconstitutional. Yet enjoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements. §§ 1903(1), 1915(a), (b); see also Brief for Individual Petitioners 63 ("There is no federal official who administers ICWA or carries out its mandates"). The state officials who implement ICWA are "not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." Lujan v. Defenders of Wildlife, 504 U.S. 555, 569, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (plurality opinion). So an injunction would not give petitioners legally enforceable protection from the allegedly imminent harm.

Petitioners' request for a declaratory judgment suffers from the same flaw. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671--672, 70 S. Ct. 876, 94 L. Ed. 1194 (1950). This form of relief conclusively resolves "'the legal rights of the parties.'" Medtronic, Inc. v. Mirowski Family Ventures, LLC, 571 U.S. 191, 200, 134 S. Ct. 843, 187 L. Ed. 2d 703 (2014) (emphasis added). But again, state officials are nonparties who would not be bound by the judgment. . . . Without preclusive effect, a declaratory judgment is little more than an advisory opinion. . . .

599 U.S. at 291--93 (footnotes omitted). As with Brackeen, in this case Mother has failed to show how this Court could grant her the relief she has requested.

¶19 In conclusion, we hold that Mother lacks standing to maintain her equal protection claim.

¶20 But even if Mother had standing, we find that her equal protection claim would fail. Both parties brought the case of Knight v. State (In re M.K. & L.K.), 1998 OK CIV APP 118, 964 P.2d 241, to our attention in their briefing because it involved the very same equal protection issue raised by Mother. We find the Court of Civil Appeals' analysis persuasive and dispositive.

¶21 The Knight case involved a non-Native father who "d[id] not contend the ICWA applied to []his [termination-of-parental-rights] case," id. ¶¶1, 6, 964 P.2d at 242--43, presumably because the minor children were also non-Native. Nevertheless, on appeal father alleged that "he was denied equal protection of the law when the trial court denied his request for a jury instruction with the same burden of proof required in termination cases involving parents of Indian children pursuant to 25 U.S.C. § 1901 et seq., the Indian Child Welfare Act (the ICWA)." Id. ¶1, 964 P.2d at 243. Although he failed to cite any case in support of his argument, the Court of Civil Appeals acknowledged "it might be argued that under the traditional equal protection analysis the disparate treatment provided by the ICWA requires strict scrutiny as discrimination based on race." Id. ¶7, 964 P.2d at 244. But after reviewing the U.S. Supreme Court's precedents in Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976), and Morton v. Mancari, 417 U.S. 535 (1974), the Court of Civil Appeals (COCA) concluded that "these kinds of statutory preferences" singling out Native Americans for "special treatment" was "neither 'invidious' nor 'racial' in character" and would be upheld under rational basis review "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." Id. (quoting Moe, 425 U.S. at 480; Mancari, 417 U.S. at 455). COCA also found support for this conclusion in an Oregon case, In re Application of Angus, 655 P.2d 208 (1982), that "ha[d] applied the [Mancari] test to non-Indian adoptive parents' argument that the ICWA is unconstitutional as a denial of equal protection." Id. ¶8, 964 P.2d at 244. There, the Oregon Court of Appeals held "the protection of the integrity of Indian families [is] a permissible goal that is rationally tied to the fulfillment of Congress' unique guardianship obligation toward the Indians." Id. (quoting In re Appl. of Angus, 655 P.2d at 213). Consequently, COCA applied the Mancari test and held "the heightened burden of proof required for termination of a child covered by ICWA is rationally tied to Congress' responsibility for policy towards Indian families" and that "[t]he trial court's failure to instruct the jury that the State was required to prove its case against Father beyond a reasonable doubt was not an error and did not violate Father's constitutional right to equal protection of the law." Id. ¶9, 964 P.2d at 244.

¶22 Since 1998 when the Knight case was decided, several other jurisdictions across the country have rejected similar equal protection arguments. See, e.g., Ruby A. v. State ex rel. Dep't of Health & Social Servs., 2003 WL 23018276, at *4--5 (Alaska Dec. 29, 2003) (unpublished); In re A.A., 176 P.3d 237, 239--40 (Kan. Ct. App. 2008); State v. Sonya L. (In re Phoenix L.), 708 N.W.2d 786, 795--98 (Neb. 2006), disapproved on other grounds in State v. Wendy A. (In re Destiny A.), 742 N.W.2d 758 (Neb. 2007); State v. S.S.M. (In re J.M.), 2022 WI App 52, ¶¶10--22, 980 N.W.2d 499 (unpublished table decision); HJO v. State ex rel. Dep't of Family Servs. (In re KMO), 2012 WY 99, ¶¶34--36, 280 P.3d 1203, 1214--15; see also In re Marcus S., 638 A.2d 1158, 1158--59 (Me. 1994) (decided before 1998, but reaching the same conclusion that "the different burdens of proof do not violate the [non-Indian] mother's right to equal protection"). At this juncture, it is worth noting some reasoning that was not voiced in COCA's Knight opinion, but which we find persuasive nevertheless. For example, the Wisconsin case observed that ICWA's special treatment of Indian children is not based on race, but on "tribal membership, which is considered a political relationship." S.S.M., 2022 WI App 52, ¶21. We concur in that logic, noting the conclusion in Mancari that statutory preferences in favor of Native Americans are "not directed towards a 'racial' group consisting of 'Indians'; instead, [any preference] applies only to members of 'federally recognized' tribes. . . . In this sense, the preference is political rather than racial in nature." Mancari, 417 U.S. at 553 n.24 (emphasis added). Thus, our finding that Mother's equal protection claim fails is supported by every case we have located from other jurisdictions.

¶23 Consequently, Mother's equal protection claim fails, and we affirm the trial court's application of the clear-and-convincing burden of proof in her case.

B. The State met its burden of clear and convincing evidence.

¶24 Mother next contends that the State did not present clear and convincing evidence that the alleged abuse was heinous and shocking, that she failed to protect her children from such abuse, and that it is in the best interests of her children to terminate her parental rights. The Petition sought to adjudicate the children deprived and to terminate Mother's parental rights for failure to protect from heinous and shocking sexual abuse pursuant to 10A O.S. 2021, § 1-4-904. This section provides in pertinent part:

A. A court shall not terminate the rights of a parent to a child unless:

1. The child has been adjudicated to be deprived either prior to or concurrently with a proceeding to terminate parental rights; and

2. Termination of parental rights is in the best interests of the child.

B. The court may terminate the rights of a parent to a child based upon the following legal grounds:

9. A finding that the parent has abused or neglected any child or failed to protect any child from abuse or neglect that is heinous or shocking;

Heinous and Shocking abuse is defined in 10A O.S. 2021, § 1-1-105(35); this paragraph provides (emphasis added):

35. "Heinous and shocking abuse" includes, but is not limited to, aggravated physical abuse that results in serious bodily, mental, or emotional injury. "Serious bodily injury" means injury that involves:

a. a substantial risk of death,

b. extreme physical pain,

c. protracted disfigurement,

d. a loss or impairment of the function of a body member, organ, or mental faculty,

e. an injury to an internal or external organ or the body,

f. a bone fracture,

g. sexual abuse or sexual exploitation,

h. chronic abuse including, but not limited to, physical, emotional, or sexual abuse, or sexual exploitation which is repeated or continuing,

i. torture that includes, but is not limited to, inflicting, participating in or assisting in inflicting intense physical or emotional pain upon a child repeatedly over a period of time for the purpose of coercing or terrorizing a child or for the purpose of satisfying the craven, cruel, or prurient desires of the perpetrator or another person, or

j. any other similar aggravated circumstance;

¶25 M.R. testified at trial for approximately four hours to a very graphic and detailed account of how she was sexually abused by Father since she was 13 years old and over a two-year period.[3] She had to write down on paper some of her more graphic testimony and have an attorney relay the information to the jury. The trauma she suffered made it nearly unbearable for her to convey the abuse verbally. She even drew pictures showing the position of her body and Father's body while performing some of the sexual acts. Mother contends that M.R. did not have any physical damage and therefore the State did not meet its burden of establishing heinous and shocking abuse. Dr. Stockett testified that although she did not witness any signs of physical trauma that physical trauma would likely not be apparent from a post-pubertal girl who was last abused weeks earlier, which was the case for M.R. when she was examined. Other testimony confirmed that M.R. had behavioral changes since the time the abuse started.

¶26 The definition of Heinous and Shocking abuse is not limited to only aggravated physical abuse. Nor did the Legislature provide a definition of "injury." Abuse is defined in 10A O.S. 2021, § 1-1-105(2) to mean "harm or threatened harm to the health, safety, or welfare of a child by a person responsible for the child's health, safety, or welfare, including but not limited to nonaccidental physical or mental injury, sexual abuse . . . ." Here, there was clear and convincing evidence of chronic sexual abuse perpetrated against M.R. by her father over a two-year period. The jury listened to the testimony and observed the witnesses. It is not difficult to see how the jury would find this ongoing abuse to be heinous and shocking. We hold the State established by clear and convincing evidence the existence of heinous and shocking sexual abuse.

¶27 Mother contends the State failed to prove by clear and convincing evidence that she did not protect her children from the abuse and that it is not in the children's best interest to terminate her parental rights. Failure to protect is defined in 10A O.S. 2021, § 1-1-105(26), as:

failure to take reasonable action to remedy or prevent child abuse or neglect, and includes the conduct of a nonabusing parent or guardian who knows the identity of the abuser or the person neglecting the child, but lies, conceals or fails to report the child abuse or neglect or otherwise take reasonable action to end the abuse or neglect; (emphasis added).

Here, the state doesn't allege that Mother knew of the abuse while it was ongoing, lied, concealed, or failed to report the abuse, but instead alleges that once she knew of the abuse she took no reasonable action to end the abuse. The State admits that initially when M.R. told her of the abuse she took reasonable steps to have M.R. examined by a doctor and reported the abuse to the police. But by the next day, Mother had already began discrediting M.R., created incredulous explanations as to why such abuse should not have occurred[4], called M.R. a liar, did not even entertain the possibility that M.R. was telling the truth, and sabotaged any attempt to find a safety plan monitor by telling all the people who were contacted that M.R. was lying. Mother expressed her opinion that once DHS was finished with its investigation, she planned on taking the children back to their home where Father resided. After the children were placed in foster care, Mother went back to live with Father. Therefore, we do not find any error in the jury's determination that the State met its burden of proof by showing clear and convincing evidence Mother failed to protect her children once she knew of the abuse.

¶28 In order to terminate parental rights it must be found by clear and convincing evidence that the termination is in the children's best interests. 10A O.S. 2021, §1-4-904(A)(2). In addition to the above stated facts related to Mother's failure to protect once she knew of the abuse, there was testimony of previous physical abuse of M.R. and of the other children. In 2021, M.R. said she was strangled by Father. She ran away to a friend's house where she stayed for a few days. Photographs were taken of red marks on her neck. The police were immediately called out and they went to M.R.'s home and arrested Father. M.R. testified that when she went back to her home one of her aunt's yelled at her while her mother just listened and did nothing. M.R. was encouraged to recant her allegations that Father choked her, which she proceeded to do. Father was then released from custody. This is another example of a time where Mother proceeded to ignore abuse caused by Father rather than seek protection of the children from him. There was other evidence presented at trial about two victim protective orders filed by Mother against Father in 2016, but they had been dismissed.

¶29 Officer Griggs testified he did not witness Mother engaging in protective behavior, such as supporting or comforting M.R. during their meeting. He was concerned Mother would take the children back to the house where Father resided. The CPS worker also testified that Mother called M.R. a liar repeatedly, and she did not seem concerned for the kids at the time; Mother believed the children were safe at home. Mother never entertained that M.R. could be telling the truth. The reason for the children's placement was due to Mother sabotaging her efforts to find a voluntary placement with a safety plan monitor. Baker's supervisor, Lacey Warren, testified that Mother was not protective of the children upon DHS's visit the day after Mother took M.R. to the doctor and the police. Mother was trying to find excuses as to why the abuse could not have happened rather than showing a desire to protect the children. She made inconsistent statements about her sexual relationship with Father. On the one hand why would Father have sex with M.R. when he could have sex with Mother and then Mother stating they did not have sex because of Father's back problems. Those excuses were refuted by the testimony of Father's oldest son who said he could often hear his parents having sex in the early morning hours. Kelly Baker, the DHS Permanency Planning worker, testified that DHS was not pursuing a reunification plan because it was a heinous and shocking case. Up until the time of trial she did not believe Mother had shown she would be a viable or safe option for the children. Baker's recommendation was that it was in the best interests of the children to terminate both parents' parental rights. The three oldest children who testified at trial, although some expressing love of their mother, all expressed a desire to stay in their current placement. M.R. further testified that there was nothing her parents could do to make her want to live with them again.

¶30 As observed by many who testified, Mother repeatedly failed to engage in protective behavior regarding her children. Her actions sabotaged any opportunity to have the children placed with family instead of foster care. Mother was willing to put the children back in their home which would have presented further risk of abuse. The jury returned a verdict to terminate Mother's parental rights and that it was in the best interest of the children. We hold the State demonstrated by clear and convincing evidence the necessary elements for termination of her parental rights and therefore, we affirm the trial court's order.

II. 121,060 Father's Appeal

A. The trial court made the requisite findings under federal and state law, and any perceived procedural errors do not rise to the level of fundamental error.

¶31 Father asserts his parental rights should not have been terminated based upon alleged procedural errors made at trial, i.e., certain required findings were not made by the trial court as required under federal and/or state law, and the trial court erred by granting the State's Motion in Limine. Although it is not clear from the record whether there was any objection made to the alleged required findings, Mother's trial court attorney filed a Response to the Motion in Limine. The November 1, 2022, Permanency/Review Order also indicates Father's trial attorney provided statements in support of the Response to the Motion in Limine. In Farris v. Masquelier, 2022 OK 91, ¶13, 524 P.3d 942, 948, we held that an issue is still reviewable for fundamental error even when no exception has been taken. Id. Fundamental error occurs when a trial court fails to accurately state the law and compromises the integrity of the proceeding to such a degree that the error has a substantial effect on the rights of one or more of the parties. Id. ¶14, 524 P.3d at 948.

¶32 Father first argues the trial court erred by not making a reasonable efforts finding to prevent the removal of the children or for a finding it was not required, within 60 days of removal of the children. He bases his argument on 45 C.F.R. § 1356.21 (2021) which requires title IV-E agencies to meet certain requirements in order to receive federal foster care funding. This section provides in pertinent part:

(b) Reasonable efforts. The title IV--E agency must make reasonable efforts to maintain the family unit and prevent the unnecessary removal of a child from his/her home, as long as the child's safety is assured; to effect the safe reunification of the child and family (if temporary out-of-home placement is necessary to ensure the immediate safety of the child); and to make and finalize alternate permanency plans in a timely manner when reunification is not appropriate or possible. In order to satisfy the "reasonable efforts" requirements of section 471(a)(15) (as implemented through section 472(a)(2) of the Act), the title IV--E agency must meet the requirements of paragraphs (b) and (d) of this section. In determining reasonable efforts to be made with respect to a child and in making such reasonable efforts, the child's health and safety must be the paramount concern.

(1) Judicial determination of reasonable efforts to prevent a child's removal from the home.

(i) When a child is removed from his/her home, the judicial determination as to whether reasonable efforts were made, or were not required to prevent the removal, in accordance with paragraph (b)(3) of this section, must be made no later than 60 days from the date the child is removed from the home pursuant to paragraph (k)(1)(ii) of this section.

(ii) If the determination concerning reasonable efforts to prevent the removal is not made as specified in paragraph (b)(1)(i) of this section, the child is not eligible under the title IV--E foster care maintenance payments program for the duration of that stay in foster care.

. . . .

(3) Circumstances in which reasonable efforts are not required to prevent a child's removal from home or to reunify the child and family. Reasonable efforts to prevent a child's removal from home or to reunify the child and family are not required if the title IV--E agency obtains a judicial determination that such efforts are not required because:

(i) A court of competent jurisdiction has determined that the parent has subjected the child to aggravated circumstances (as defined in State, or for a Tribal title IV--E agency, Tribal law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse);

. . . .

(d) Documentation of judicial determinations. The judicial determinations regarding contrary to the welfare, reasonable efforts to prevent removal, and reasonable efforts to finalize the permanency plan in effect, including judicial determinations that reasonable efforts are not required, must be explicitly documented and must be made on a case-by-case basis and so stated in the court order.

(1) If the reasonable efforts and contrary to the welfare judicial determinations are not included as required in the court orders identified in paragraphs (b) and (c) of this section, a transcript of the court proceedings is the only other documentation that will be accepted to verify that these required determinations have been made.

(2) Neither affidavits nor nunc pro tunc orders will be accepted as verification documentation in support of reasonable efforts and contrary to the welfare judicial determinations except for a Tribal title IV--E agency for the first 12 months that agency's title IV--E plan is in effect as provided for in section 479B(c)(1)(C)(ii)(I) of the Act.

(3) Court orders that reference State or Tribal law to substantiate judicial determinations are not acceptable, even if such law provides that a removal must be based on a judicial determination that remaining in the home would be contrary to the child's welfare or that removal can only be ordered after reasonable efforts have been made.

(k) Removal from the home of a specified relative.

(1) For the purposes of meeting the requirements of section 472(a)(1) of the Act, a removal from the home must occur pursuant to:

. . . .

(ii) A judicial order for a physical or constructive removal of the child from a parent or specified relative.

Father argues this section requires a determination that reasonable efforts were made to prevent removing the children from the home and a determination that such efforts were not required, if that be the case, within 60 days of the removal of the children. In his brief he quotes part of the Federal Register comments concerning 1356.21 (b)(3) (emphasis added) (his quotation is in bold). The comments provide:

Comment: A couple of commenters requested that we clarify that we are not prescribing the timing for judicial determinations that reasonable efforts are not required to reunify the family.

Response: The commenters are correct that we are not prescribing the time frame for judicial determinations that reasonable efforts to reunify the child and family are not required. We do not think it is appropriate to prescribe a time frame for obtaining such a determination and have made this clarification in paragraph (b)(3). However, all judicial determinations with respect to reasonable efforts to prevent removals, even determinations that such efforts are not required, must be obtained within the time frame prescribed in paragraph (b)(1), within 60 days of the date the child is removed from the home. Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed. Reg. 4020-01, 4054 (Jan. 25, 2000).

The comments indicate a determination that reasonable efforts were made to prevent the children's removal from the home, or such efforts were not required, need be made within 60 days. It does not demand a finding that reasonable efforts to reunify the children and family is not required must be made within the 60-day period.

¶33 Here, for instance, in part A under the reasonable efforts section of the July 18, 2022, Emergency Custody Hearing Order, the court makes a specific finding that continuation of all the children in the home is contrary to the health safety or welfare because of the allegations of lack of proper parental care/guardianship, threat of harm, failure to protect, and sexual abuse. Part B.2 then finds reasonable efforts have been made to prevent the need to remove all the named children. The court made specific findings as to its determination: "DHS ATTEMPTED TO LOCATE A SAFETY MONITOR FOR THE CHILDREN AND MOTHER HOWEVER WAS UNABLE TO IDENTIFY ANYONE, THERE ARE CONCERNS AS THE MOTHER DOES NOT BELIEVE THE CHILD'S DISCLOSURE OF SEXUAL ABUSE, SAFETY CONCERNS ARE UNABLE TO BE MANAGED WITHOUT COURT INTERVENTION." The court listed grounds found under 10A O.S. 2021, § 1-4-809, i.e., "sexual abuse" which, as mentioned earlier, falls under the definition of heinous and shocking in 10A O.S. 2021, § 1-1-105 (35). Section 10A O.S. 2021, § 1-4-809 lists grounds for when a court "may" make a finding that "reasonable efforts to prevent the removal of a child from home . . . are not required." Under paragraph 2 of subsection A, one of the grounds is "d. subjected any child to aggravated circumstances including, but not limited to, heinous and shocking abuse or heinous and shocking neglect." Therefore, we find the court made the required findings concerning reasonable efforts. It found what reasonable efforts were made, why they failed, and stated the grounds, without just a reference to a statute, that justified reasonable efforts to not be required. Reasonable efforts were made to find a voluntary placement with friends or family which was obstructed by Mother. Placement in the home with Father was certainly not going to be an appropriate remedy at least at this stage of the proceedings, when he was accused of causing the sexual abuse and he adamantly said M.R. was lying. The court listed "sexual abuse" as a grounds for why reasonable efforts to keep the children within the home would not be required. Father was put on notice well within 60 days of the children's removal of why the children were being removed from the home. We do not find Father was deprived of due process or the court's actions compromised the integrity of the proceedings to such a degree to rise to a fundamental error.

¶34 Father also argues, absent a finding that reunification was not required under 10A O.S. 2021, § 1-4-809, the trial court should have required DHS to provide reasonable efforts to reunify the family and allow no less than three months to correct the conditions which led to the adjudication of the children as deprived pursuant to 10A O.S. 2021, § 1-4-707(C)(2). 10A O.S. 2021, § 1-4-707(C) provides:

C. 1. In any dispositional order removing a child from the home of the child, the court shall make a determination as to whether, in accordance with the best interests and the health, safety, or welfare of the child, reasonable efforts have been made to provide for the safe return of the child to the child's own home.

2. If reasonable efforts are required for the safe return of the child to the child's home, the court shall allow the parent of the child not less than three (3) months to correct the conditions which led to the adjudication of the child as a deprived child; however, the time period for reunification services may not exceed seventeen (17) months from the date that the child was initially removed from the child's home, absent a finding of compelling reasons to the contrary.

3. If the court finds that continuation of reasonable efforts to return the child home are inconsistent with the permanency plan for a child, the court shall determine whether reasonable efforts have been made to complete the steps necessary to finalize the permanent placement of the child.

4. Reasonable efforts to reunite the child with the child's family shall not be required pursuant to the provisions of Section 1-4-809 of this title.

Title 10A O.S. 2021, § 1-4-904(A)(1) provides that a child can be adjudicated deprived either prior or concurrently with a proceeding to terminate parental rights. Title 10A O.S. 2021, § 1-4-502(A)(1) additionally provides that "When the initial petition to determine if a child is deprived also contains a request for termination of parental rights in which case the court shall determine if the child should be adjudicated deprived and, if so, the jury shall determine if parental rights should be terminated." In the present case, the trial court adjudicated the children deprived at trial and prior to the submission of the issue of parental rights termination to the jury. It subsequently entered an Adjudication/Disposition Order dated November 4, 2022, adjudicating the children deprived. On the last day of trial, November 4, 2022, the verdicts were read terminating both parents' parental rights.

¶35 The Adjudication/Disposition Order made findings as to the reasonable efforts made to return the children to their home. It determined to do so was contrary to the welfare of the children for various reasons including "SEXUAL ABUSE; SHOCKING AND HEINOUS." It further describes the reasonable efforts that were made to prevent the need for removal of the children. The court also found reasonable efforts have been made to finalize the permanency plan. It approved the permanency plan which was checked for "Adoption" and did not check the box for "Reunification." It determined the conditions causing the children to be deprived was "sexual abuse of child[ren] or failure to protect from sexual abuse" and the abuse was "SHOCKING AND HEINOUS". The court did not check the box which states reasonable efforts to reunite the children was not required pursuant to 10A O.S. 2021, § 1-4-809. Father alleges the court erred by not making a finding that reunification was not required pursuant to 10A O.S. 2021, § 1-4-809 and by not granting the parents 3 or more months to correct conditions pursuant to 10A O.S. 2021, § 1-4-707(C)(2).

¶36 We do not find the trial court erred by not granting at least 3 months for the parents to correct conditions. Although the trial court did not check the 10A O.S. 2021, § 1-4-809 box[5], it is clear from the order that the conditions creating the deprived status were sexual abuse that was shocking and heinous and under § 1-4-809 reasonable efforts to prevent removal of the children from the home or reunification was not required. The language of 10A O.S. 2021, § 1-4-707(C)(4) does not require the court to make a finding that reunification is not required. It merely states, "4. Reasonable efforts to reunite the child with the child's family shall not be required pursuant to the provisions of Section 1-4-809 of this title." Here the grounds found in § 1-4-809 were clearly established in the order, regardless if the box was not checked. Further, paragraphs 2 and 3 of 10A O.S. § 1-4-707(C) are both conditional determinations. The court found that reasonable efforts to prevent the children's removal from their home had failed and determined it would be contrary to their welfare to continue in their home due to, among other things, sexual abuse that was shocking and heinous. The court was not making a finding under paragraph 2 that reasonable efforts are required to return the children to their home and therefore, a minimum three-month window to correct conditions was not applicable. The court instead decided under paragraph 3 that reasonable efforts had been made to finalize the permanency plan. We hold the trial court did not err and complied with the requirements of § 707(C) in its dispositional order.

B. The trial court did not err in granting the State's Motion in Limine.

¶37 Next, Father argues the trial court improperly granted the State's Motion in Limine to prevent the parties from mentioning the fact that no State criminal charges had been filed against him. Father claims it was unfair and prejudicial for him not to be able to question one of the officer/witnesses whether charges had been filed. His claim is based on the fact that Officer Griggs and Detective Vincent testified as to their part in the investigation of M.R.'s disclosure of sexual abuse. He believes having law enforcement testify implies there is a criminal case pending. The State refutes that the taking of law enforcement testimony in a juvenile case is inherently prejudicial. They assert the testimony of law enforcement is vital and essential to many child deprivation and abuse cases because they typically are involved in the investigation.

¶38 The testimony of law enforcement in this matter was related to the interviews and allegations concerning M.R.'s disclosure of sexual abuse. There was no mention by law enforcement at trial as to whether charges were filed or were to be filed. In Matter of K.H., 2021 OK 33, ¶31, 507 P.3d 647, 654, we determined hearings for termination of parental rights are conducted under the Evidence Code, 12 O.S. 2011, §§ 2401-2403, and the issue before us was whether pending criminal charges against the parents was relevant and admissible under the code. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. ¶32, 507 P.3d at 654, citing 12 O.S. 2011, § 2401. Evidence that is not relevant is not admissible. Id. 

¶39 The four elements the State must prove by clear and convincing evidence to terminate parental rights for heinous and shocking abuse are:

1) The child has been adjudicated deprived;

2) The parent abused the child or a sibling of the child;

3) The abuse was heinous and shocking; and,

4) Termination of parental rights is in the best interests of the child.

Id. ¶33, 507 P.3d at 655; See 10A O.S. 2021, § 1-4-904(A)(1), (B)(9). We held that whether there were pending charges against the parents was not relevant to the first element which concerns the trial court's duty to adjudicate the children deprived. Id. ¶35, 507 P.3d at 655. We also held, the charges filed against the parents represented the State's legal opinion and therefore provided no tendency to make the existence more or less probable of the second and third elements, i.e., whether the parents abused the child or whether the abuse was heinous and shocking. Id. ¶¶37-39, 507 P.3d at 655-56. As to the fourth element, best interests of the child, we determined even if evidence of criminal charges could be construed as relevant, the probative value of such evidence is substantially outweighed by the danger of unfair prejudice. Id. ¶40, 507 P.3d at 656. We found that evidence is admissible unless the trial court determines "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise." Id. We held, the State received beneficial prejudice from the evidence of pending charges against the parents because it "harmed Parents' credibility with the jury at the outset of the trial and planted in the jurors' minds Parents' uncertain future with their children." Id. ¶41, 507 P.3d at 656. We determined the trial court abused its discretion by admitting the pending criminal charges as evidence and reversed its judgment. Id. ¶50, 507 P.3d at 658.

¶40 In the present matter, the reverse situation occurred from the one in Matter of K.H., i.e., here the State wanted to exclude any evidence of whether criminal charges have or have not been filed. We hold, the trial court correctly granted the State's Motion in Limine for several reasons. Like in Matter of K.H., whether there are any pending charges is not relevant to proving whether abuse occurred in this termination proceeding. The fact that law enforcement officers testified about their work in this juvenile matter was not testimony concerning any work in a pending criminal matter. Law enforcement officers, as the State asserts, are commonly called to testify as to their involvement in juvenile matters. The trial court would not allow testimony or questions concerning any pending criminal case. If for instance, the court allowed Father's attorney to question the law enforcement officers about whether charges have been filed, it would open the door to testimony that charges had not yet been filed but were being considered. We agree with the State, this would run afoul of our ruling in Matter of K.H. Further, just as the parents in Matter of K.H. were unfairly prejudiced by the evidence of pending criminal charges because their credibility was harmed at the outset of the trial, the State would be unfairly prejudiced by evidence that charges had not yet been filed because it would harm M.R.'s credibility and place in the minds of the jurors that the abuse probably did not occur. The burden of proof in a criminal matter is beyond a reasonable doubt, a much higher burden of proof than in a termination of parental rights case, which is clear and convincing evidence. Whether to file a criminal sexual abuse case would most likely take more time to gather enough evidence for a prosecutor to determine if he or she can meet that higher burden of proof. The fact that criminal charges had not yet been filed by the time of trial is not relevant as to whether there is clear and convincing evidence that the abuse occurred for purposes of termination of parental rights.

CONCLUSION

¶41 We hold that Mother lacks standing to challenge the constitutionality of ICWA and the trial court did not violate Mother's right to equal protection under the law by failing to apply a heightened burden of proof under ICWA. Further, the trial court did not err in finding the State presented clear and convincing evidence sufficient to support the verdicts nor do we find the trial court failed to make requisite findings under state and federal law. For the foregoing reasons, we also hold the State's Motion in Limine was properly granted. Therefore, we affirm the trial court's orders terminating the parental rights of both parents, Victoria Rodriguez and Everardo Rodriguez, Sr.

PREVIOUSLY RETAINED ON THIS COURT'S OWN MOTION;
DISTRICT COURT AFFIRMED

 

¶42 Rowe, V.C.J., Kauger, Winchester, Edmondson, Combs, Gurich, and Darby, JJ., concur;

¶43 Kane, C.J., and Kuehn, J., concur in result.

FOOTNOTES

[1] The petition in error in 120,910, attaches the wrong termination order. The termination order attached is the one for the father, Everardo, and not the one for the mother, Victoria. We assume the mother is appealing the termination order which is nearly identical and concerning her termination of parental rights. Both orders were issued on November 7, 2022, as separate orders.

[2] Our State Constitution limits district court jurisdiction to "all justiciable matters, except as otherwise provided in this Article." Okla. Const. art. VII, § 7 (emphasis added). This Court's appellate review of all such "cases at law and in equity[,] except . . . criminal cases," id. § 4 (emphasis added), is by extension similarly limited to justiciable matters.

[3] M.R.'s testimony included, her father would lock the bedroom door, he would touch her body and made her give him oral sex, masturbate him, and sometimes they had intercourse. This occurred up to 3 times a week. S.R.'s testimony confirmed that Father would lock the bedroom door when M.R. was in the room. M.R. described how his penis smelled and how he changed soaps and would give her Lifesavers to keep her from gagging. She also testified she was worried that Father would start doing the same thing to her younger sister S.R.

[4] Mother explained that her husband had a back injury and would have difficulty having sex. However, this explanation was refuted by Father's oldest son who testified he could hear his parents having sex often in the early morning hours. Mother also contradicted her statement by saying she did not understand why Father would have sex with M.R. when he could have sex with her.

[5] The Adjudication/Disposition Order provided under part A, a check box for "Reasonable efforts to reunite the child[ren] with the child[ren]'s family are not required pursuant to Title 10A O.S. § 1-4-809 and a permanency hearing is set for ______, if applicable." If the court had merely checked this box which only references a state statute, rather than specifying the applicable grounds under that section of law, then it would arguably run afoul of 45 C.F.R. 1356.21 (d)(3), which would find it unacceptable for a court to merely reference a state law to substantiate its determination.

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2008 OK CIV APP 15, 177 P.3d 590, 
IN THE MATTER OF J.S.
Discussed

 
1998 OK CIV APP 118, 964 P.2d 241, 69 OBJ 2949, 
In the Matter of M.K. and L.K.
Discussed at Length

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1940 OK 468, 107 P.2d 542, 188 Okla. 184, 
STATE ex rel. THAREL v. BOARD OF COM'RS OF CREEK COUNTY
Discussed

 
1993 OK 162, 865 P.2d 1232, 65 OBJ 33, 
Hendrick v. Walters
Discussed at Length

 
1994 OK 148, 890 P.2d 906, 65 OBJ 4214, 
Toxic Waste Impact Group, Inc. v. Leavitt
Discussed

 
1994 OK 136, 890 P.2d 1329, 65 OBJ 4037, 
Anderson v. Eichner
Discussed

 
1970 OK 67, 468 P.2d 501, 
TULSA EXPOSITION & FAIR CORP. v. BD. OF CO. COM'RS
Discussed

 
2002 OK 83, 64 P.3d 1080, 
IN THE MATTER OF S.B.C.
Discussed

 
2006 OK 80, 155 P.3d 1, 
IN THE MATTER OF THE ADOPTION OF L.D.S.
Discussed at Length

 
1996 OK 135, 932 P.2d 1110, 68 OBJ 22, 
In Re: Anderson
Discussed

 
2010 OK 81, 243 P.3d 21, 
IN THE MATTER OF C.D.P.F.
Discussed at Length

 
2011 OK 77, 261 P.3d 1159, 
IN THE MATTER OF THE ADOPTION OF G.D.J.
Discussed

 
1979 OK 119, 600 P.2d 317, 
WEBB v. WILEY
Discussed

 
2020 OK 56, 473 P.3d 475, 
INDEPENDENT SCHOOL DISTRICT # 52 v. HOFMEISTER
Discussed

 
2020 OK 63, 466 P.3d 559, 
IN THE MATTER OF L.M.A.
Discussed

 
2021 OK 33, 507 P.3d 647, 
IN THE MATTER OF K. H.
Discussed

 
2022 OK 91, 524 P.3d 942, 
FARRIS v. MASQUELIER
Discussed at Length

 
1981 OK 21, 626 P.2d 1323, 
Allgood v. Allgood
Discussed

 
1981 OK 131, 637 P.2d 66, 
C. G., Matter of
Discussed at Length

 
1982 OK 2, 639 P.2d 1233, 
Independent School Dist. No. 9 of Tulsa County v. Glass
Discussed

 
1982 OK 106, 652 P.2d 271, 
Democratic Party of Oklahoma v. Estep
Discussed

 
1982 OK 146, 653 P.2d 1230, 
State ex rel. Cartwright v. Oklahoma Tax Com'n
Discussed

 
1999 OK 16, 976 P.2d 545, 70 OBJ 778, 
Cities Service Co. v. Gulf Oil Corp.
Discussed at Length

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 2401, 
Relevant Evidence Defined
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA